UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————— x
                                            :
AMERICAN FEDERATION OF MUSICIANS            :
OF THE UNITED STATES AND CANADA,            :
                                            :
        Plaintiff,                          :
                                            :
        v.                                  :    Case No. 1:26-cv-04760-ER
                                            :
WARNER RECORDS, INC.,                       :    **ORAL ARGUMENT REQUESTED**
ATLANTIC RECORDING CORP., and               :
UNIVERSAL MUSIC GROUP, INC.,                :
                                            :
                                            :
        Defendants.                         :
———————————————————————————— x

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT UNIVERSAL MUSIC GROUP, INC.'S MOTION TO DISMISS <u>THE FIRST AMENDED COMPLAINT</u>

Orin Snyder
Brian Ascher
Lefteri J. Christos
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Tel: (212) 351-4000
OSnyder@gibsondunn.com
BAscher@gibsondunn.com
LChristos@gibsondunn.com

Ilissa Samplin
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel: (213) 229-7354
ISamplin@gibsondunn.com

*Counsel for Defendant*
*Universal Music Group, Inc.*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 5

I.    The Parties and the Sound Recording Labor Agreement .................................... 5

II.   Article 21: Written Rates and Imported Rates for "New Uses" ........................... 6

III.  The Alleged Udio License ................................................................................. 7

IV.   AFM's Claim, Its Omissions, and This Motion ................................................. 8

LEGAL STANDARD ...................................................................................................... 9

ARGUMENT .................................................................................................................. 11

    I.    Article 21(a) Draws Its Payment Obligation From a Separate AFM Agreement, and No
          AFM Agreement Governs the AI Use. ........................................................... 11

          A.    The Text of Article 21(a) Makes a Separate AFM Agreement the Sole Measure of
                Any New-Use Payment ........................................................................ 11

          B.    By AFM's Own Pleading and Concession, No AFM Agreement Governs the AI
                Use, So Article 21(a) Requires No Payment. .......................................... 13

          C.    AFM's Contrary Readings Delete the Words the Parties Wrote and Add Words
                They Did Not. .................................................................................... 14

II.   The Structure of Article 21 Confirms That Every Compensable New Use Carries a
      Bargained Rate, and the AI Use Carries None. ................................................ 16

III.  If Article 21(a) Reached the AI Use, the Asserted Obligation Would Be Too Indefinite to
      Enforce. .......................................................................................................... 19

IV.   The Notice Claim Falls With the Payment Claim. ............................................ 23

V.    Dismissal Should Be With Prejudice, Because No Amendment Can Supply an Agreement
      That Does Not Exist. ....................................................................................... 24

CONCLUSION ............................................................................................................... 25

## TABLE OF AUTHORITIES

**CASES**

*Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp.*,
    230 F.3d 569 (2d Cir. 2000)....................................................................................10, 16

*Am. Fed'n of Musicians & Emps.' Pension Fund v. Atl. Recording Corp.*,
    203 F. Supp. 3d 301 (S.D.N.Y. 2016)..............................................................10, 15, 18, 25

*Am. Fed'n of Musicians of the U.S. & Canada v. Sony Music Entm't, Inc.*,
    2016 WL 3031029 (S.D.N.Y. May 2, 2016) ...................................................................13, 15

*AmTrust N. Am., Inc. v. Signify Ins. Ltd.*,
    2019 WL 3034891 (S.D.N.Y. July 11, 2019) ........................................................................23

*Anthem, Inc. v. Express Scripts, Inc.*,
    2022 WL 1558879 (S.D.N.Y. Mar. 31, 2022) ......................................................................20

*Arag-A Ltd. v. Republic of Argentina*,
    178 F. Supp. 3d 192 (S.D.N.Y. 2016)...................................................................................18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................................9, 14

*Ashwood Cap., Inc. v. OTG Mgmt., Inc.*,
    99 A.D.3d 1 (1st Dep't 2012) ...............................................................................................10

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)....................................................................................................9, 22

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)....................................................................................................9

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*,
    74 N.Y.2d 475 (1989) ..............................................................................................20, 21

*Consarc Corp. v. Marine Midland Bank, N.A.*,
    996 F.2d 568 (2d Cir. 1993)...................................................................................................10

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991).......................................................................................................9

*Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*,
    93 N.Y.2d 584 (1999) .............................................................................................................20

*GEM Advisors, Inc. v. Corporación Sidenor, S.A.*,
    667 F. Supp. 2d 308 (S.D.N.Y. 2009).....................................................................................20

*Goodstein Constr. Corp. v. City of New York*,
    80 N.Y.2d 366 (1992) ...................................................................................................20

*Hayden v. County of Nassau*,
    180 F.3d 42 (2d Cir. 1999)............................................................................................24

*Impax Labs., Inc. v. Turing Pharms. AG*,
    2017 WL 4357893 (S.D.N.Y. Sept. 29, 2017)..............................................................18

*Int'l Audiotext Network, Inc. v. AT&T Co.*,
    62 F.3d 69 (2d Cir. 1995) (per curiam)..........................................................................9

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*,
    52 N.Y.2d 105 (1981) ...................................................................................................20

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
    424 F.3d 195 (2d Cir. 2005)..........................................................................................15

*Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010).....................................................................................10, 15

*M&G Polymers USA, LLC v. Tackett*,
    574 U.S. 427 (2015).........................................................................................................9

*Mtume v. Sony Music Entm't*,
    2020 WL 4895360 (S.D.N.Y. Aug. 19, 2020)...........................................................10, 14

*Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*,
    830 F.3d 152 (2d Cir. 2016).....................................................................................10, 16

*Ridenhour v. Bryant*,
    2020 WL 1503626 (S.D.N.Y. Mar. 29, 2020) ..............................................................20

*Shaw Grp., Inc. v. Triplefine Int'l Corp.*,
    322 F.3d 115 (2d Cir. 2003)..........................................................................................15

*Sussman Sales Co. v. VWR Int'l, LLC*,
    2021 WL 1165077 (S.D.N.Y. Mar. 26, 2021) ..............................................................10

*U.S. Tr. Co. of N.Y. v. Jenner*,
    168 F.3d 630 (2d Cir. 1999)..........................................................................................10

**STATUTES**

29 U.S.C. § 185.....................................................................................................................2, 8

**RULES**

Fed. R. Civ. P. 12(b)(6)............................................................................................................1

Defendant Universal Music Group, Inc. ("UMG") respectfully submits this memorandum in support of its motion to dismiss the First Amended Complaint (Ex. 1, the "FAC") of plaintiff American Federation of Musicians of the United States and Canada ("AFM") as against UMG.

## PRELIMINARY STATEMENT

This case should be dismissed under Rule 12(b)(6) because the parties' written agreement, the Sound Recording Labor Agreement (Ex. 2, the "SRLA"), forecloses AFM's sole claim as a matter of law. AFM's own pleading admissions, coupled with its concessions at the pre-motion conference, confirm the point. Because the defect lies in the text of the contract itself, not in the FAC's allegations, no amendment can cure it. Dismissal should be with prejudice.

One question decides this motion: Does any AFM agreement price the use of sound recordings to train generative AI? The answer is no, and it is AFM that says so. AFM's FAC pleads that the "[u]se of sound recordings in generative AI software models is not a purpose covered by the SRLA." Ex. 1 (FAC) ¶ 45. The FAC identifies no other AFM agreement that covers the use. AFM's counsel conceded both points at the pre-motion conference on July 21, 2026: "[T]here is no rate in the [SRLA] for AI use," Ex. 3 (Tr.) at 5:19–20, and "there is no underlying agreement for AI use"—"[w]e conceded that," *id.* at 7:16–17. In its pleading and at the podium, AFM gives the same answer.

AFM's claim rests on Article 21(a) of the SRLA. For a use the SRLA does not cover, Article 21(a) directs the Company to pay "an amount equal to all payments . . . that would be required under the AFM agreement that would then be effective if the recording were originally made for" the new purpose. Ex. 2 (SRLA) Art. 21(a). The provision does not set the price. It says where the price lives: in the separate AFM agreement that governs the new use. If an album recording is licensed for use in a film, the AFM agreement governing film supplies the rate; the

1

musicians are paid as if the recording had been made for the film in the first place. For the AI use alleged here—UMG's licensing of sound recordings to the artificial-intelligence developer Udio for use in training AI models and generating outputs (the "AI Use"), Ex. 1 (FAC) ¶¶ 45–46—AFM concedes no such agreement exists. A payment measured by an agreement that does not exist is no payment at all. Article 21(a) therefore required UMG to pay nothing, UMG breached nothing, and the claim fails on the face of the pleading. Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, the statute under which AFM brings its claim, empowers the Court to enforce the agreement the parties made—not to supply the payment term they reserved for future collective bargaining. What AFM has not obtained at the bargaining table, it cannot collect from this Court.

This case is not about whether musicians should be compensated whenever new technologies emerge. It is about when they are entitled to compensation under the agreement they negotiated. The agreement answers that question. It provides two—and only two—sources of compensation for a new use. Where the parties chose to price a new technology in the SRLA itself, they wrote the rate directly into Article 21(b) through (h). Where they did not, Article 21(a) incorporates the payment terms of the separate AFM agreement governing that new use. The question before the Court is therefore not whether musicians should be compensated for the AI Use. It is whether the parties' existing agreements already establish a payment obligation for that use. They do not.

AFM's pleading talks about artificial intelligence. The case is about a contract, and how that contract pays musicians. The SRLA is a payment system. Musicians play recording sessions, and Article 4 requires companies to pay for that work at the wage scales in Exhibit A. Ex. 2 (SRLA) Art. 4 & Ex. A. The bargain is simple: Play the session, get paid for the session, at rates the parties set. When a recording later travels into a new medium, Article 21 governs, and

2

the parties built it with exactly two rate sources.  Where they wanted a new use priced within the SRLA itself, they wrote the rate: Paragraphs 21(b) through 21(h) name and price video games, consumer products, mobile applications, and more.  Each paragraph is a negotiated answer to a new technology, at a negotiated rate.  For every other new use, Article 21(a) points to the separate AFM agreement, if any, that governs the new purpose.  Every rate in this system was bargained.  A rate fashioned by a court appears nowhere in the design.

The provision's words hand the Court a two-step inquiry.  Step one: Does the SRLA itself price the new use, as paragraphs 21(b) through 21(h) do for the new uses the parties selected?  Step two: If not, did the parties negotiate a separate AFM agreement that governs the new use?  Those are the only two sources of payment the agreement provides.  Both steps come up empty here, on AFM's own account.  The FAC invokes none of the written rates; the claim rests on Article 21(a) alone.  And the FAC identifies no AFM agreement governing the AI Use.  AFM is a party to every AFM agreement.  No litigant is better positioned to name the one that governs, and AFM has named none because there is none, as its counsel has now told the Court.  The pointer has nowhere to land.  No rate here, none there.  No payment obligation, and no breach.  That is the whole case.

Ordinary principles of contract law confirm each step.  The plain-meaning rule: Clear words are enforced as written, and Article 21(a) ties payment to "the AFM agreement that would then be effective," an agreement that exists, not one the parties may someday negotiate.  Negative implication: Paragraphs 21(b) through 21(h) name and price the uses the parties selected; generative AI is not on the list, and that silence is a choice, not a gap.  And the rule against rewriting: A court may enforce the rates the parties set; it may not set one for them.

That outcome is neither an oversight nor unfair.  The parties built the SRLA knowing new technologies would emerge, and they chose how each would be compensated: through collective

3

bargaining.  The history of Article 21 reflects that bargain.  Video games did not receive a judge-made rate; they received paragraph 21(b).  Every technology in the SRLA's history received a negotiated answer, not a judicial one.  The same process is underway now.  At the July 21 conference, AFM's counsel informed the Court that negotiations over the SRLA are underway, Ex. 3 (Tr.) at 8:1–3, and counsel for Warner Music Group Corp. ("WMG") confirmed that proposals concerning AI compensation have already been exchanged, *id.* at 13:14–15.  If those negotiations produce an agreement governing the AI Use, Article 21(a) will apply it.  As AFM concedes, no such agreement exists today.

The text supplies a further, independent ground for dismissal.  Even if Article 21(a) somehow imposed a payment obligation for the AI Use (it does not), no court could enforce it.  The SRLA contains no rate, no formula, and no benchmark by which any payment for the AI Use could be fixed.  AFM is not asking the Court to read this contract; it is asking the Court to finish it by supplying the number the parties never negotiated.  Ordinary contract principles say no.

AFM's notice theory falls with its payment theory.  Article 21(a) requires notice "to effect such a 'new use.'"  Where there is no compensable new use to effect, the duty never arises.

Because the SRLA is unambiguous and integral to the FAC, every question this motion presents is one of law.  There is nothing for discovery to discover: The answer is in the text.  And what is in the text is beyond amendment.  The missing piece of AFM's claim is not an allegation but an agreement, and a pleading cannot create a contract the parties never made.  The Court should dismiss AFM's claim against UMG with prejudice.

## FACTUAL BACKGROUND

### I.    The Parties and the Sound Recording Labor Agreement

UMG is the largest recording company and distributor of music in the world.  Ex. 1 (FAC) ¶ 11.  AFM is the largest union of professional musicians in the world; its members include the session musicians who perform on commercial sound recordings.  *Id.* ¶¶ 9–10.  AFM alleges that UMG and its co-defendants, Warner Records, Inc. and Atlantic Recording Corp. (together, the "Warner Defendants"), "ha[ve each] been a signatory to and bound to the SRLA" and "are parties to the SRLA."  *Id.* ¶¶ 12–16, 51.[1]

The SRLA is a collective bargaining agreement between AFM and signatory record companies.  Ex. 1 (FAC) ¶ 51.  It covers musicians' services "in the recording of phonograph records" and certain concert DVDs and music videos.  Ex. 2 (SRLA) Art. 2; Ex. 1 (FAC) ¶ 35.  And it defines "phonograph record" broadly: "any phonograph record, digital audio file, compact disc, tape recording or any other device reproducing sound, whether now in existence or which may come into existence."  Ex. 2 (SRLA) Art. 1; Ex. 1 (FAC) ¶ 35 n.19.  For that covered work, the SRLA fixes the pay, stating that the Company (the SRLA's term for a signatory record company) "shall pay at least Federation scale as provided in Exhibit A . . . ."  Ex. 2 (SRLA) Art. 4; *see id.* Ex. A (setting minimum wages and other working conditions).  The bargain is simple: Play the session, get paid for the session, at rates the parties set.

The SRLA is one of several AFM collective bargaining agreements, and its text says so. Article 16 addresses music "previously recorded under an American Federation of Musicians agreement other than any Sound Recording Labor Agreement" where "such agreement requires

---

[1]For purposes of this motion only, UMG accepts as true the FAC's allegations that it is a signatory to and bound by the SRLA. Ex. 1 (FAC) ¶¶ 12, 51–52. UMG does not concede those allegations, and it reserves all rights to contest them, including that it is a proper defendant.

payment for such use." Ex. 2 (SRLA) Art. 16.  And Article 21(a), the provision under which AFM sues, turns on "the AFM agreement that would then be effective" for a given purpose.  *Id.* Art. 21(a).  The SRLA thus presupposes a family of AFM agreements, each governing its own category of recorded work and carrying its own payment terms.  *See id.* Arts. 16, 21(a).

## II.    Article 21: Written Rates and Imported Rates for "New Uses"

Article 21 addresses the "new use" of a covered recording, meaning its use "for a purpose not covered by this Agreement."  Ex. 2 (SRLA) Art. 21(a); Ex. 1 (FAC) ¶ 36.  The article prices new uses in two ways.

*First*, written rates.  Paragraphs 21(b) through 21(h) price specific new uses the parties chose to address: video games (¶ 21(b)); "Non-Traditional Uses" (uses in consumer products, new media, and consumer-based internet synch licensing) at a rate of 3% of revenue (¶ 21(c)); low-fee television, cable, and motion-picture licenses at the greater of 7% of the Company's revenue from the license or $165 (¶ 21(d)); mobile applications (¶ 21(e)); low-fee "life cycle" licenses for weddings and similar personal videos (¶ 21(f)); and foreign licenses (¶ 21(g)), with administrative mechanics in paragraph 21(h).  Ex. 2 (SRLA) Art. 21(b)–(h).  Each substantive paragraph names its use and states its bargained rate.  The FAC describes the paragraphs the same way: They "define a company's new use payment obligation in certain circumstances (e.g., for use in video games) as a percentage of its licensing revenue rather than" the amount that would be required under the otherwise-effective AFM agreement. Ex. 1 (FAC) ¶ 37.

*Second*, imported rates.  For every other new use, Article 21(a) applies "[e]xcept as set forth in paragraphs 21(b) through 21(h) below," and it directs the Company to pay the musicians who performed on the recording "an amount equal to all payments (including, without limitation, pension contributions, but excluding health and welfare contributions) that would be required

under the AFM agreement that would then be effective if the recording were originally made for the purpose set forth under that agreement." Ex. 2 (SRLA) Art. 21(a); *accord* Ex. 1 (FAC) ¶ 36 (block-quoting the payment sentence). The measure of payment, in other words, is supplied by a different AFM agreement, the one that would have governed had the recording originally been made for the new purpose. If a recording made for an album is later licensed for use in a film, for example, the compensation is what the AFM agreement governing film work requires.

Article 21(a) also ties notice to the effecting of any "new use": "In order to effect such a 'new use,' the Company must first provide the Federation's Sound Recording Labor Agreement Contracts Administrator with the identity of the records involved and the intended use of the product in the form set forth in Exhibit F to this Agreement." Ex. 2 (SRLA) Art. 21(a); *see* Ex. 1 (FAC) ¶¶ 39–40 (describing the Exhibit F requirements).

## III. The Alleged Udio License

In June 2024, UMG and the Warner Defendants sued two artificial-intelligence companies, Suno and Udio, asserting copyright claims based on the unauthorized copying of sound recordings to train generative AI models. Ex. 1 (FAC) ¶¶ 2 & n.1, 19. AFM alleges that in late 2025, UMG reached a settlement with Udio, *id.* ¶ 26; that, on information and belief, the settlement includes a compensatory element for past copying together with a licensing arrangement authorizing Udio's use of recordings, *id.* ¶ 27; and that the settlement "contemplate[s] the development and launch of AI music platforms based on licensed catalogs and authorized recordings," *id.* ¶ 28.

The FAC alleges that UMG licensed sound recordings to Udio "for use in training their AI models and generating outputs," *id.* ¶ 46; *see id.* ¶ 41; that, on information and belief, thousands of the licensed recordings "are subject to the terms of the SRLA" and embody performances by AFM-represented musicians, *id.* ¶¶ 32, 44; and it quotes UMG's public statements describing the

arrangements, *id.* ¶¶ 27 & n.14, 33.

## IV.    AFM's Claim, Its Omissions, and This Motion

The FAC pleads a single cause of action: breach of the SRLA under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  Ex. 1 (FAC) ¶¶ 50–61.  The claim proceeds on two theories.  First, AFM alleges that the "[u]se of sound recordings in generative AI software models is not a purpose covered by the SRLA," *id.* ¶ 45, that the licensing of recordings for AI training and output generation therefore "constitutes a new use under Article 21(a)," *id.* ¶ 46; *see id.* ¶ 57, and that UMG has paid musicians nothing for it, *id.* ¶¶ 47, 59.  Second, AFM alleges that UMG failed to provide the notice and information required by Article 21(a) and Exhibit F.  *Id.* ¶¶ 48–49, 60.  AFM seeks declarations of breach, damages, fees, and interest.  *Id.* ¶ 63.

Two omissions in the FAC decide this motion.  The FAC identifies no AFM agreement that governs or prices the AI Use.  *See generally* Ex. 1 (FAC) (referencing only the SRLA, its exhibits, and the alleged Udio and Suno arrangements).  And it invokes none of the separately priced paragraphs in Article 21(b)–(h); the claim rests on Article 21(a) alone.  *Id.* ¶¶ 38, 46–47, 55, 57 (each resting the compensation theory on Article 21(a) or on the SRLA generally, never on paragraphs 21(b) through 21(h)).

AFM filed the Complaint on June 5, 2026.  ECF No. 1.  UMG requested a pre-motion conference by letter dated July 7, ECF No. 13; then-defendant WMG did the same by letter dated July 10, ECF No. 19; AFM responded by letters dated July 17, ECF No. 25 (corrected response to UMG); ECF No. 26 (response to WMG); and the Court held the conference on July 21.  At the conference, AFM's counsel acknowledged that the SRLA contains no rate for the AI Use, Ex. 3 (Tr.) at 5:19–20; that no AFM agreement covers the AI Use, *id.* at 7:16–17; and that AFM does not know what uses will be made of Udio's outputs, *id.* at 18:8–9.  AFM's counsel also

informed the Court that negotiations over the SRLA are underway. *Id.* at 8:1–3. WMG's counsel confirmed that proposals on AI compensation have already been exchanged. *Id.* at 13:14–15. The Court granted UMG leave to file this motion, stayed all discovery pending its resolution, and directed AFM to file an amended complaint to substitute the Warner Defendants for WMG by July 24. Minute Entry of July 21, 2026. AFM filed the FAC on July 24. ECF No. 28. This motion follows.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court accepts well-pleaded factual allegations as true, but "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On this motion, the Court may also consider any document "incorporated in [the FAC] by reference" or "integral" to it. *Int'l Audiotext Network, Inc. v. AT&T Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991)); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (a document is "integral" where the complaint "relies heavily upon its terms and effect"). The SRLA is both: The FAC quotes its operative provisions, and its single Section 301 claim alleges their breach. Ex. 1 (FAC) ¶¶ 35–40, 50–61.

Collective bargaining agreements are interpreted "according to ordinary principles of contract law." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). The plain-meaning rule controls: When such an agreement's provisions "are unambiguous, they must be given effect as written," and "[o]nly when provisions are ambiguous may courts look to extrinsic factors" such

9

as bargaining history or past practices. *Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp.*, 230 F.3d 569, 576 (2d Cir. 2000). Whether a contract is ambiguous is a question of law, and where the language is unambiguous, the Court may resolve its meaning on a motion to dismiss. *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 155–57 (2d Cir. 2016). Language is unambiguous when it "has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010). And where the contract is unambiguous, the Court must "give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning." *U.S. Tr. Co. of N.Y. v. Jenner*, 168 F.3d 630, 632 (2d Cir. 1999) (quoting *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993)).

Two corollaries govern this motion. The first is the rule against rewriting. A court may not, "under the guise of contract interpretation," "add additional terms" the parties did not agree to. *Am. Fed'n of Musicians & Emps.' Pension Fund v. Atl. Recording Corp.*, 203 F. Supp. 3d 301, 310 (S.D.N.Y. 2016); *accord Ashwood Cap., Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 7 (1st Dep't 2012) ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." (citation omitted)); *Sussman Sales Co. v. VWR Int'l, LLC*, 2021 WL 1165077, at *15 (S.D.N.Y. Mar. 26, 2021) ("The Court cannot rewrite the Agreement where Plaintiff failed to negotiate for the requirements that it now deems vital to the Agreement's purpose."). The second is that a breach-of-contract claim that rests on a provision that does not impose the obligation alleged fails at the pleading stage. *Mtume v. Sony Music Entm't*, 2020 WL 4895360, at *5 (S.D.N.Y. Aug. 19, 2020) (Ramos, J.) (dismissing breach-of-contract counterclaims where

10

provisions invoked imposed no such obligation on party alleged to have breached).

<strong>ARGUMENT</strong>

**I.    Article 21(a) Draws Its Payment Obligation From a Separate AFM Agreement, and No AFM Agreement Governs the AI Use.**

Article 21(a) does not impose the payment obligation AFM asserts. It is a rate-conversion provision, not an open-ended royalty provision. The only obligation it imposes is defined by another agreement: The Company must pay what "the AFM agreement that would then be effective" for the new purpose would require. Ex. 2 (SRLA) Art. 21(a). For the AI Use, no such agreement exists. AFM pleads that the SRLA does not cover the use, Ex. 1 (FAC) ¶ 45, and identifies no other AFM agreement that does, *see generally* Ex. 1 (FAC). AFM conceded both points at the pre-motion conference: There is neither an SRLA rate for the AI Use nor a separate AFM agreement governing it. Ex. 3 (Tr.) at 5:19–20, 7:16–17. Without a referent, Article 21(a)'s cross-reference has nowhere to land. The text frames a straightforward two-step inquiry. Does the SRLA itself price the use? If not, did the parties negotiate a separate AFM agreement that governs it? Step one is undisputed on AFM's own pleading. The claim dies at step two.

**A.    The Text of Article 21(a) Makes a Separate AFM Agreement the Sole Measure of Any New-Use Payment.**

Article 21(a) is two sentences, and its first sentence decides this case. The trigger is the use of a covered recording "for a purpose not covered by this Agreement." Ex. 2 (SRLA) Art. 21(a). The command is that the Company "shall pay" the musicians who performed on the recording, and what it commands to be paid is "an amount equal to all payments (including, without limitation, pension contributions, but excluding health and welfare contributions) that would be required under the AFM agreement that would then be effective if the recording were originally made for the purpose set forth under that agreement." *Id.* The same clause creates the obligation and defines its measure. There is no duty to pay first and find a measure later. There

11

is no "if" without a "which." What the Company must pay is not a sum Article 21(a) states; it is the sum another agreement states. Without that other agreement, the command commands nothing.

Every element of the measure depends on the separate agreement. The provision points to "the AFM agreement" that would then be effective for the new purpose. Ex. 2 (SRLA) Art. 21(a). "The," not "an" or "any": A definite article needs a definite object. The provision's closing words, "the purpose set forth under that agreement," are a back-reference, and a back-reference must reach back to something: an agreement already identified, one that exists and can be found. The clause reads as a hypothetical, but the hypothetical concerns the recording, not the agreement: The reader imagines that the recording had "originally" been "made for" the new purpose, and then asks what the agreement governing that purpose would require. *Id.* Article 21(a) looks to one agreement for both the governing purpose and the payment owed. Here, there is no such agreement. Without that agreement, the formula cannot operate.

The surrounding provisions confirm this design was deliberate. When the parties wanted a rate stated in the SRLA itself, they wrote one: Paragraphs 21(b) through 21(h) price the specific new uses the parties chose to cover, each with its own rate and payment mechanics. Ex. 2 (SRLA) Art. 21(b)–(h); *accord* Ex. 1 (FAC) ¶ 37. When the parties wanted an existing SRLA fee to measure a use crossing *into* its domain, music recorded under a different AFM agreement and used in a phonograph record, they said that too: "[T]he use payments shall be the minimum session fee set forth in the Sound Recording Labor Agreement in effect at the time of such use." Ex. 2 (SRLA) Art. 16. Article 21(a) contains neither device. It states no rate and designates no SRLA fee; it points outward, to the separate agreement governing the new purpose. The parties knew how to write every alternative AFM now asks the Court to supply. They wrote none of them into

12

Article 21(a).

The only court to discuss this language read it the same way. In *American Federation of Musicians of the United States & Canada v. Sony Music Entertainment, Inc.* ("*AFM v. Sony*"), AFM sought payment for musicians after a recording made under the SRLA was used in a film, a purpose governed by a separate collective bargaining agreement, the Basic Theatrical Motion Picture Agreement ("MPA"), which "covers the terms and conditions, including compensation, for musicians 'whose services are rendered in connection with the production of theatrical motion pictures.'" 2016 WL 3031029, at *1 (S.D.N.Y. May 2, 2016). The court observed that Article 21(a)'s new-use formula "would seem, in turn, to point to" the MPA, the agreement governing the new medium. *Id.* at *2 n.5. *AFM v. Sony* resolved a discovery motion, not the merits, but its reading is the only one the words allow, and it shows the provision functioning as designed. There, an AFM agreement governed the new medium; the pointer landed on solid ground, and every path to payment ran through an agreement that existed. Here, the pointer lands on air.

### B.    By AFM's Own Pleading and Concession, No AFM Agreement Governs the AI Use, So Article 21(a) Requires No Payment.

The FAC pleads the formula and omits its only input. It alleges that the "[u]se of sound recordings in generative AI software models is not a purpose covered by the SRLA." Ex. 1 (FAC) ¶ 45. It does not allege that any other AFM agreement covers that purpose, and it identifies none: no agreement, no rate, no payments that "would be required" anywhere. *See generally* Ex. 1 (FAC). The omission is not incidental, and it is not a pleading defect that repleading could cure. An amended complaint can add allegations; it cannot add an agreement. AFM is a party to every AFM agreement. If one governed the AI Use and supplied the rate Article 21(a) imports, no litigant would be better positioned to identify it. Yet the FAC identifies none, and AFM's counsel

13

closed the question at the pre-motion conference on July 21, 2026, acknowledging that no AFM agreement covers AI training. Ex. 3 (Tr.) at 7:16–17 ("[T]here is no underlying agreement for AI use. We conceded that."). An amount "equal to all payments . . . that would be required under" a nonexistent agreement is no amount at all.

The consequence follows from first principles. A claim for breach of contract must rest on a provision that imposes the obligation allegedly breached. *Mtume*, 2020 WL 4895360, at *5. Article 21(a) imposes a payment obligation measured entirely by a separate agreement's requirements. Where no separate agreement supplies a requirement, the provision requires nothing, and there is nothing UMG could have failed to pay. The FAC's refrain that the licensing "constitutes a new use," Ex. 1 (FAC) ¶¶ 46, 57, for which compensation is owed, *id.* ¶ 55, is a legal conclusion about the meaning of Article 21(a). It is precisely the kind of allegation the Court does not accept as true. *Iqbal*, 556 U.S. at 678. The provision's text controls, and the text requires no payment here.

### C. AFM's Contrary Readings Delete the Words the Parties Wrote and Add Words They Did Not.

AFM's answer is that Article 21(a) itself creates the payment obligation and the cross-reference merely quantifies "what, not *if*, a company must pay." *See* ECF No. 25 at 2; *see also* Ex. 1 (FAC) ¶ 38 (construing Article 21(a) to require signatories "to compensate" musicians for any non-covered use). The text forecloses that argument. Article 21(a) contains no freestanding command to compensate. Its only command is to pay "an amount equal to all payments . . . that would be required under the AFM agreement that would then be effective." Ex. 2 (SRLA) Art. 21(a). The measure is not separate from the duty. It is the duty. Reading the provision to obligate payment of some undefined, court-determined sum deletes the words the parties wrote and substitutes words they did not—"a reasonable amount," perhaps, or "an

amount to be determined." *See* Ex. 3 (Tr.) at 5:23–24 ("[T]he damages from that, we think, can be determined by the Court.").

New York law does not permit the substitution. Courts may not, "under the guise of contract interpretation," "add additional terms" to an agreement, *Atl. Recording*, 203 F. Supp. 3d at 310, and must construe an agreement "so as to give full meaning and effect to all of its provisions," *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quoting *Shaw Grp., Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003)).

*AFM v. Sony* does not help AFM either. AFM leans on the court's statement that the absence of a damages-calculation provision does not bar damages. ECF No. 25 at 2 (quoting *AFM v. Sony*, 2016 WL 3031029, at *3). That statement addressed a claim under Article 8, the SRLA's rule restricting the purposes for which a session may be called, a conduct rule with no payment term attached. It confirmed only that a breach of such a rule may be measured through an agreement that exists; every path to damages in *AFM v. Sony* ran through the MPA. Article 21(a) is different in kind. Its entire content is the measure, so where the referenced agreement does not exist the provision imposes no obligation at all, and there is no liability for a damages measure to quantify. AFM also dismisses *AFM v. Sony*'s reading of Article 21(a) as a passing example. ECF No. 25 at 3. But that reading, pointing to the agreement that governs the new purpose, is the only construction of the provision the decision offers, and AFM proposes no other. To the extent AFM recasts the point as one about remedies, with the duty settled and only the amount open, the argument fails for the independent reasons explained in Part III, *infra*.

Nor is Article 21(a) ambiguous. Language is ambiguous only when it reasonably bears more than one meaning, that is, when there is a "reasonable basis for a difference of opinion" about what the words say. *Law Debenture*, 595 F.3d at 467. AFM does not offer a second

15

reading of Article 21(a)'s words; it offers a substitute for them: a duty to pay an amount the provision does not state, measured by a source the provision does not name. Dissatisfaction with what plain text yields is not ambiguity, and an unwelcome result does not make an unambiguous provision ambiguous.

That disposes of AFM's demand for discovery into bargaining history and past practice. *See* ECF No. 25 at 2. AFM's own lead authority permits resort to such extrinsic evidence only after a provision is found ambiguous, and directs that unambiguous provisions be given effect as written. *Aeronautical Indus.*, 230 F.3d at 576. Extrinsic evidence cannot create the ambiguity that is the precondition for consulting it. The dubbing history and the video-game practice AFM invokes, ECF No. 25 at 2, appear nowhere in the FAC, *see generally* Ex. 1 (FAC), and a pleading that must be defended from outside it has already failed. The video-game example proves UMG's point in any event. When the parties wanted video games priced, they bargained for paragraph 21(b) and wrote the rate. That is how a new use becomes compensable under this contract. The Court may resolve the claim now. *Orchard Hill*, 830 F.3d at 155–57.

Article 21(a) gives AFM exactly what the parties agreed to: a bargained rate whenever a bargained rate exists. Because none exists for the AI Use, the provision requires no payment, and the payment claim fails as a matter of law.

## II.    The Structure of Article 21 Confirms That Every Compensable New Use Carries a Bargained Rate, and the AI Use Carries None.

The architecture of Article 21(a) confirms what its text commands. Article 21(a) operates "[e]xcept as set forth in paragraphs 21(b) through 21(h) below," an express subordination to the paragraphs that follow. Ex. 2 (SRLA) Art. 21(a). Those paragraphs reveal a single, consistent design: Every compensable new use carries a bargained rate. Where the parties wanted a use priced within the SRLA, they wrote the rate themselves. Where a separate AFM agreement

16

supplies the rate, Article 21(a) imports it.  Those are the scheme's only two rate sources.  A third source, a rate fashioned by a court, appears nowhere in the SRLA, and AFM's claim cannot survive without one.

The paragraphs are a catalog of bargains the parties struck: video games (¶ 21(b)); "Non-Traditional Uses" at 3% of revenue (¶ 21(c)); low-fee television, cable, and motion-picture licenses at the greater of 7% of the Company's license revenue or $165 (¶ 21(d)); mobile applications (¶ 21(e)); low-fee "life cycle" licenses (¶ 21(f)); foreign licenses (¶ 21(g)); and administrative mechanics for those payments (¶ 21(h)).  Ex. 2 (SRLA) Art. 21(b)–(h).  Each substantive paragraph names its use and states its rate.  None directs the reader to another agreement; none leaves an amount open; and none invites a court to set one.

AFM's own FAC describes the paragraphs the same way.  AFM alleges the paragraphs "define a company's new use payment obligation in certain circumstances (e.g., for use in video games) as a percentage of its licensing revenue rather than" the payments that would be required under the otherwise-effective AFM agreement.  Ex. 1 (FAC) ¶ 37.  That is precisely UMG's reading: Written rates standing in the place where Article 21(a)'s cross-reference would otherwise do the work.  The parties' drafting practice is therefore plain on the face of the agreement.  When they want a new use priced within the SRLA, they name the use and write the rate.  The canon of negative implication, *expressio unius est exclusio alterius*, states the corollary: What the parties did not name, they did not price.  Silence here is not a gap for the Court to fill.  It is a choice the parties made.  The AI Use appears in none of the paragraphs, and AFM invokes none; its claim rests on Article 21(a) alone.  Ex. 1 (FAC) ¶¶ 38, 46, 55, 57; *accord* Ex. 3 (Tr.) at 5:19–20 ("[T]here is no rate in the [SRLA] for AI use.").  So the question is whether a court should do for AFM what the parties did for video games, consumer products, and mobile applications: supply a rate for a

17

hitherto-unlisted use.

This District has answered that question, in this industry and within this contract's own family, and this Court has repeatedly declined to supply contract terms the parties themselves omitted.  In *Atlantic Recording*, AFM's pension fund read an instrument that modifies the SRLA to impose payment obligations for audio streams that its text did not state.  The court held the instrument "clear and unambiguous," declined "to add additional terms to the parties' agreement under the guise of contract interpretation," and construed it "as written in fact, not as Plaintiffs would rewrite it in their argument."  203 F. Supp. 3d at 310; *see id.* at 308 (noting the instrument modifies the SRLA).  It then dismissed the claim with prejudice, on the pleadings, holding further amendment futile.  *Id.* at 311 (citing *Arag-A Ltd. v. Republic of Argentina*, 178 F. Supp. 3d 192, 203 (S.D.N.Y. 2016)).  The corollary governs too: A court may not supply terms "nowhere to be found in the relevant provisions."  *Impax Labs., Inc. v. Turing Pharms. AG*, 2017 WL 4357893, at *10 (S.D.N.Y. Sept. 29, 2017) (Ramos, J.).

AFM tries to turn both cases around, urging that *Atlantic Recording* rested on an express disclaimer and *Impax* forbids the narrowing UMG proposes.  *See* ECF No. 25 at 2–3.  Neither point holds.  *Atlantic Recording* did not turn on a disclaimer; it applied the rule that a court may not add terms under the guise of interpretation, and that rule governs whether or not the parties affirmatively disclaimed the obligation.  *Impax* applied the same rule, declining to read into a provision limiting words that were "nowhere to be found."  2017 WL 4357893, at *10.  Nor does UMG propose any narrowing.  UMG has never contended that unlisted uses fall outside Article 21 altogether.  Its position is that a use neither priced in paragraphs 21(b) through 21(h) nor governed by another AFM agreement through Article 21(a) carries no payment duty.  That reading gives full effect to Article 21(a).  The provision operates whenever an AFM agreement governs the new use,

18

as one did in *AFM v. Sony*.  It is AFM that must add words the parties never wrote—a rate for a use they never priced—and that is what *Atlantic Recording* and *Impax* forbid.

AFM's structural rejoinder concedes the design.  Article 21(a), it says, states the general rule; paragraphs 21(b) through 21(h) merely carve exceptions; and the AI Use therefore falls comfortably within the residual.  *See* ECF No. 25 at 2.  The premise is right, and it proves UMG's point.  A use outside the paragraphs may well fall within Article 21(a)'s trigger, as AFM pleads.  Ex. 1 (FAC) ¶¶ 45–46.  But Article 21(a)'s own terms then govern.  They do not establish a rate.  They import one from "the AFM agreement that would then be effective."  Ex. 2 (SRLA) Art. 21(a); *supra* Part I.  The paragraphs therefore do not narrow the trigger; they confirm the scheme's only two sources of payment.  Each paragraph is a negotiated substitute for the imported measure, which makes sense only if Article 21(a) would otherwise have applied: A substitute presupposes the thing substituted.  *See* Ex. 1 (FAC) ¶ 37 (describing the paragraphs as rates adopted "rather than" the imported measure).  For a use with neither an imported measure nor a written substitute, the agreement supplies exactly what the parties wrote for it: no rate.

Text and structure point the same way.  Under Article 21, every payment obligation carries a bargained rate, written or imported, and the AI Use carries neither.

### III.    If Article 21(a) Reached the AI Use, the Asserted Obligation Would Be Too Indefinite to Enforce.

The claim fails for an independent reason even on AFM's reading of "new use."  Assume, wrongly, that Article 21(a) somehow reached the AI Use.  Pay what?  Under which agreement?  At what rate?  The contract does not say, because the parties never said.  The provision's only measure of payment is its cross-reference, the cross-reference yields nothing here, and New York law does not permit a court to enforce a payment obligation the contract gives it no way to price, or to substitute a measure the parties did not choose.

19

Definiteness is a prerequisite to enforcement.  "[B]efore the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained"; otherwise a court would be "imposing its own conception of what the parties should or might have undertaken." *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981) (reversing a lower court's imposition of a reasonable rent the parties never agreed to). Where a provision "contains no methodology, formula, or external measure by which the Court might objectively determine the compensation to be paid," it is unenforceable.  *GEM Advisors, Inc. v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 326 (S.D.N.Y. 2009); *accord Ridenhour v. Bryant*, 2020 WL 1503626, at *5 (S.D.N.Y. Mar. 29, 2020) (dismissing a contract claim whose compensation term, a share of the "value added," was too indefinite); *see Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999) (a binding contract requires "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms").  Nor may a court base damages on "the prospective terms of a nonexistent contract."  *Anthem, Inc. v. Express Scripts, Inc.*, 2022 WL 1558879, at *9 (S.D.N.Y. Mar. 31, 2022) (Ramos, J.) (quoting *Goodstein Constr. Corp. v. City of New York*, 80 N.Y.2d 366, 373 (1992)).  New York recognizes a narrow exception.  An open price term may still be enforced "if the amount can be determined objectively without the need for new expressions by the parties," through "a method for reducing uncertainty to certainty" that is "found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage."  *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (1989). *Cobble Hill* lets a court calculate a number the parties left open—not invent a method they never chose.

20

Here, the parties chose their method. Article 21(a) designates one measure, and no other: "all payments . . . that would be required under the AFM agreement that would then be effective if the recording were originally made for" the new purpose. Ex. 2 (SRLA) Art. 21(a). For the AI Use, that method produces no amount, because no AFM agreement is "then . . . effective" for the purpose. *Supra* Part I. This is not a gap for the Court to fill. The parties chose a method, and that method yields no payment here. If anything, *Cobble Hill* confirms the point. The "method for reducing uncertainty to certainty" here is "found within the agreement," in the cross-reference itself, and it resolves the question against AFM. 74 N.Y.2d at 483. AFM's attempt to set *GEM Advisors* aside, on the ground that the contract there left the price for later agreement while the SRLA merely lacks a damages formula, *see* ECF No. 25 at 2, misreads both. Article 21(a) does not lack a formula. It states one, and the formula produces no amount here.

Nor does the SRLA itself supply a substitute. Neither its session scale nor paragraph 21(c)'s "Non-Traditional Uses" rate applies. AFM points to the possibility that Udio's AI-generated tracks will be streamed on platforms like Spotify, for which the SRLA sets rates, and to other potential destinations such as video games, sampling, and commercials, for which the SRLA likewise establishes express rates. *See* ECF No. 25 at 2–3. But each theory defeats itself. If the AI Use is governed by one of the SRLA's existing rates, then it is, by definition, a use covered by the SRLA—contradicting AFM's own allegation that the AI Use "is not a purpose covered by the SRLA." Ex. 1 (FAC) ¶ 45.

The downstream destinations fail for an independent reason. AFM pleaded a use, the licensing of recordings for AI training and output generation, and the claim is tested on that use, not on the places Udio's outputs might later travel. Ex. 1 (FAC) ¶¶ 45–46; *see id.* ¶¶ 57–60 (resting the claim on the licensing alone). What someone might later do with an output is a different

21

question, and it does not turn the alleged training license into a use governed by another AFM agreement. AFM conceded as much at the July 21 conference, offering the theory as "entirely possible, in our view," Ex. 3 (Tr.) at 6:2–3, and introducing its lead example, an AI track marketed on Spotify, as "a hypothetical completely," *id.* at 6:6–7. A theory its own proponent offers as "entirely possible" sits on the wrong side of "the line between possibility and plausibility," *Twombly*, 550 U.S. at 557, and an obligation cannot be measured by uses that exist only as hypotheticals. The session scale fares no better. Article 21(a) points to the agreement effective for the new purpose, which by AFM's pleading the SRLA is not, Ex. 1 (FAC) ¶ 45, and Article 16 shows the parties knew how to designate the SRLA's own session fee for a cross-agreement use when they wanted to. They did not do so here. *Supra* Part I.A. Borrowing a rate for a use its provision does not reach is rate-setting, not interpretation.

Discovery cannot supply the missing contract term. Courts postpone definiteness questions past the pleadings only where the contract itself invites an outside standard that evidence might identify. Article 21(a) invites none. It designates a single measure of payment: the amount required under the AFM agreement governing the new purpose. No amount of discovery into license economics, industry custom, or market value could produce the measure Article 21(a) requires, because none of those things is "the AFM agreement that would then be effective." AFM ultimately concedes the point. Responding to WMG's pre-motion letter, AFM agrees with "the unremarkable proposition that courts may not unilaterally insert contract terms" into an agreement. ECF No. 26 at 2. Yet that is precisely what its theory requires. Supplying a rate the parties never negotiated is exactly the insertion of a contract term AFM agrees the Court cannot undertake.

## IV.     The Notice Claim Falls With the Payment Claim.

AFM's remaining theory is that UMG failed to provide notice and information under Article 21(a) and Exhibit F.  Ex. 1 (FAC) ¶¶ 39–40, 48–49, 56, 60.  The theory is derivative of the first, and it fails with it.  The notice sentence reads: "In order to effect such a 'new use,' the Company must first provide the Federation's Sound Recording Labor Agreement Contracts Administrator with the identity of the records involved and the intended use of the product in the form set forth in Exhibit F to this Agreement."  Ex. 2 (SRLA) Art. 21(a).  The sentence carries its own limit.  Notice is required "[i]n order to effect such a 'new use'"—the same "new use" the paragraph has just defined.  "Such" ties the duty to the payment provision it follows; "first" merely sequences the notice relative to the new use being effected.  The duty is a step in effecting a compensable new use, not a freestanding reporting covenant.  Where no compensable new use exists to effect, there is nothing for the notice to precede, and the duty never arises.  *Cf. AmTrust N. Am., Inc. v. Signify Ins. Ltd.*, 2019 WL 3034891, at *9 (S.D.N.Y. July 11, 2019) (Ramos, J.) (payment duties "never arose" where a contractual condition was unmet).

AFM's answer is that the notice duty stands on its own as an informational covenant, allowing the union to learn what recordings have been licensed and to whom, whether or not any payment is owed.  *See* ECF No. 25 at 3; ECF No. 26 at 2; Ex. 1 (FAC) ¶¶ 48–49, 56, 60.  AFM's own description of the duty defeats the argument.  It says the information is needed to establish rates of pay and benefits owed to musicians.  ECF No. 25 at 3.  But there are no rates to establish where no agreement governs the use.  AFM seeks information to determine a payment obligation the contract never creates.  The monitoring AFM describes exists only to facilitate the payment obligation its first theory cannot establish.  And the text permits no separation.  Article 21(a)

23

contains no independent information covenant; its only notice language is the sentence quoted above, which states the duty's purpose and its trigger in the same breath.

Where Article 21 gives notice a further role, it says so expressly: Once "the Federation has been provided notice of the license," AFM "shall look only to the licensee" for payments under certain paragraphs.   Ex. 2 (SRLA) Art. 21(h)(iv).   There as here, notice serves the payment machinery.   Nor does UMG's reading let a Company slip Article 21(a)'s net.   Where an AFM agreement governs a new purpose, the payment obligation exists and the notice duty operates exactly as written.   Both duties fail here for the same reason: No agreement governs this use.   Reading the sentence as a standing audit right, owed whenever recordings are licensed for any non-covered purpose, compensable or not, would sever it from the "new use" it exists to effect and add to the SRLA an obligation the parties did not write.   That is the same rewriting the payment theory requires, and it fails for the same reason.   *Supra* Parts I–II.

## V.    Dismissal Should Be With Prejudice, Because No Amendment Can Supply an Agreement That Does Not Exist.

Leave to replead is properly denied where the plaintiff "is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal."   *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).   This is that case.   The defect in AFM's claim is not a missing allegation; it is a missing agreement.   Article 21(a) pays a new use only at the rate supplied by "the AFM agreement that would then be effective" for the new purpose.   Ex. 2 (SRLA) Art. 21(a).   No pleading can create an agreement the parties never made.   AFM is a party to every AFM agreement.   It has identified none that covers AI training, and its counsel represented to the Court that none exists. Ex. 3 (Tr.) at 7:16–17.   The FAC itself post-dates UMG's pre-motion letter, which set out each of the arguments in this motion, ECF No. 13, and the amended pleading still names no agreement, because there is none to name.   There is nothing further to allege.

24

This District has entered exactly this disposition within this contract's own family. In *Atlantic Recording*, the court dismissed a payment claim under an SRLA-modifying instrument on the pleadings and with prejudice: "[W]here an unambiguous document requires dismissal in a contract case, further amendment will often be futile." 203 F. Supp. 3d at 311. More facts cannot fix a provision that does not say what AFM needs it to say. Dismissal should be with prejudice.

## CONCLUSION

Both of AFM's theories rest on the same missing premise: an AFM agreement governing the AI Use. None exists, by AFM's own pleading and its counsel's concession at the pre-motion conference. Section 301 empowers the Court to enforce the agreement the parties made, not to create one they did not. AFM cannot collect from this Court what it has not obtained at the bargaining table.

At the pre-motion conference, the Court concluded by "encourag[ing the parties] to continue the collective bargaining process." Ex. 3 (Tr.) at 22:8–9. The Court should dismiss AFM's claim against UMG with prejudice and without leave to amend, clearing the way for the collective bargaining process to resolve.

25

Dated:   August 5, 2026                    Respectfully submitted,
         New York, NY


                                           GIBSON, DUNN & CRUTCHER LLP



                                           By:   /s/ Orin Snyder
                                               Orin Snyder
                                               Brian Ascher
                                               Lefteri J. Christos
                                               200 Park Avenue
                                               New York, NY 10166-0193
                                               Tel: (212) 351-4000
                                               OSnyder@gibsondunn.com
                                               BAscher@gibsondunn.com
                                               LChristos@gibsondunn.com

                                               Ilissa Samplin
                                               333 South Grand Avenue
                                               Los Angeles, CA 90071-3197
                                               Tel: (213) 229-7354
                                               ISamplin@gibsondunn.com

                                               *Counsel for Defendant*
                                               *Universal Music Group, Inc.*


                                           26

## CERTIFICATE OF COMPLIANCE

I, Orin Snyder, hereby certify that this memorandum of law complies with the length restrictions in Local Civil Rule 7.1(c), as modified by § 2.B.i of this Court's Individual Practices.

I further certify that this memorandum of law contains 8,442 words, including any footnotes or endnotes and excluding only those sections of the brief that are exempted under Local Civil Rule 7.1(c) and this Court's Individual Practices.  In preparing this certificate of compliance, I have relied on the word count of the word-processing system used to prepare this memorandum of law.

By: */s/ Orin Snyder*
Orin Snyder

27