**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA,

Plaintiff,

v.

WARNER RECORDS, INC., ATLANTIC RECORDING CORP., and UNIVERSAL MUSIC GROUP, INC.,

Defendants.

Case No. 1:26-cv-04760-ER

**PLAINTIFF AMERICAN FEDERATION OF MUSICIANS OF THE UNITED STATES AND CANADA'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

Eyad Asad
Cohen, Weiss and Simon LLP
909 Third Avenue, 12th Floor
New York, New York 10022
(212) 356-0249
easad@cwsny.com

*Attorneys for Plaintiff*
*American Federation of Musicians of*
*The United States and Canada*



15059025.3

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ........................................................................................ 3

The Parties and the SRLA........................................................................................ 3

Defendants' Lawsuits against Udio and Suno ........................................................................ 4

STANDARD OF REVIEW ........................................................................................ 6

ARGUMENT........................................................................................ 6

I. Governing Standard: A Motion to Dismiss a Breach of Contract Claim Should be Denied Where the Contract is Reasonably Susceptible to Multiple Interpretations and the Plaintiff's Reading is Plausible ........................................................ 6

II. The Complaint Should not be Dismissed Because Article 21(a) of SRLA is Reasonably Susceptible to More Than one Interpretation........................................ 7

A. Article 21(a) looks to the agreement that covers musicians' services, not what agreement covers the downstream use. ........................................ 7

B. Article 21(a) establishes a mandatory payment obligation. ........................................ 10

1. Article 21(a) requires that a signatory company "shall pay" the artist for a new use. ........................................ 10

2. The Court may determine damages even in the absence of a formula for them ........................................ 11

3. A damages calculation would not be too indefinite........................................ 11

C. Article 21(a) would also apply to downstream uses by Suno and Udio. .............. 13

III. The Structure of the SRLA and the Parties' Bargaining History Supports the AFM's Position that Defendants' AI Licenses are New Uses Under the SRLA.............. 14

IV. The Parties' Experience with Video Games Establishes that Article 21(a) is Subject to Different Interpretations ........................................ 16

V. The SRLA's Provisions Covering Sampling Constitute an AFM Agreement that Applies to Defendants' AI Licenses ........................................ 17

VI. The SRLA Requires Defendants to Provide Notice and Information Regarding Their Sampling Arrangements with Suno and Udio........................................ 18

CONCLUSION........................................................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aeronautical Indus. Dist. Lodge 91 of IAM v. United Techs. Corp.*,
230 F.3d 569 (2d Cir. 2000)....................6, 7

*AFM v. Sony Music Entertainment*,
No. 15-CV-05249 (GBD) (BCM), 2016 WL 3031029 (S.D.N.Y. May 2, 2016)....................11

*American Federation of Musicians & Employers' Pension Fund v. Atlantic Recording Corp.*,
203 F. Supp. 3d 301 (S.D.N.Y. 2016)....................15

*Anthem, Inc. v. Express Scripts, Inc.*,
16 Civ. 2048 (ER), 2022 WL 1558879 (S.D.N.Y. Mar. 31, 2022) (Ramos, J.) ....................13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................6

*Cambridge Capital LLC v. Ruby Has LLC*,
565 F. Supp. 3d 420 (S.D.N.Y. 2021)....................7

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*,
74 N.Y.2d 475, 548 N.E.2d 203 (1989)....................12

*Demolition Workers Union, Local 95 v. Mackroyce Contracting Corp.*,
No. 97 CIV. 4094 LMM, 2000 WL 297244 (S.D.N.Y. Mar. 22, 2000)....................7

*Dist. Lodge 26, IAM v. United Techs. Corp.*,
610 F.3d 44 (2d Cir. 2010)....................12

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*,
375 F.3d 168 (2d Cir. 2004)....................6, 7

*GEM Advisors, Inc. v. Corporación Sidenor, S.A.*,
667 F. Supp. 2d 308 (S.D.N.Y. 2009)....................13

*H.K. Porter Co. v. NLRB*,
397 U.S. 99 (1970)....................16

*Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Cas. Co.*,
905 F.3d 84 (2d Cir. 2018)....................18

*Impax Laboratories, Inc. v. Turing Pharmaceuticals AG*,
16 Civ. 3241 (ER), 2017 WL 4357893 (S.D.N.Y. Sept. 28, 2017) ....................16

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998)....................10

*Local 78, Asbestos, Lead & Hazardous Waste Laborers v. Termon Constr., Inc.*,
521 F. Supp. 2d 316 (S.D.N.Y. 2007)....................12

*Lodges 743 & 1746, IAM v. United Aircraft Corp.*,
534 F.2d 422 (2d Cir. 1975)....................12

*Maniolos v. United States*,
741 F. Supp. 2d 555 (S.D.N.Y. 2010)....................6

*N.Y. Dist. Council No. 9, Int'l Bhd. of Painters & Allied Trades v. NLRB*,
453 F.2d 783 (2d Cir. 1971)....................16

*Roadrunner Charters, Inc. v. New York City*,
No. 25-CV-01285 (JAV), 2026 WL 2149758 (S.D.N.Y. July 27, 2026)....................6

*Romanova v. Amilus Inc.*,
138 F.4th 104 (2d Cir. 2025) ....................6

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
425 F.3d 119 (2d Cir. 2005)....................6

*Teamsters v. Lucas Flour Co.*,
369 U.S. 95 (1962)....................12

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
487 F.3d 89 (2d Cir. 2007)....................12

**Statutes**

Labor Management Relations Act, Section 301 ....................1, 11, 12

Plaintiff American Federation of Musicians of the United States and Canada (the "AFM") submits this memorandum of law in opposition to the motion to dismiss filed by Defendant Universal Music Group, Inc. ("UMG" or "Universal") and the motion to dismiss filed by Defendants Warner Records, Inc. ("Warner") and Atlantic Recording Corp. ("Atlantic) (Warner and Atlantic are hereafter referred to as "Warner").

## PRELIMINARY STATEMENT

The AFM brings this action pursuant to Section 301 of the Labor Management Relations Act (the "LMRA") because Defendants—among the largest music companies in the world—licensed sound recordings made by AFM-represented musicians to AI companies Suno and Udio without compensating those musicians or providing the information required under the parties' collective bargaining agreement, the Sound Recording Labor Agreement (the "SRLA"). Those recordings embody the musicians' work, created with their own instruments, talent, creativity, and hard work. Defendants' licenses permitted that work to be fed into AI systems for commercial exploitation.

Defendants' position is especially untenable given what they told the courts in June 2024. Defendants sued Suno and Udio for copyright infringement, alleging that the AI companies had scraped, copied, and ingested vast quantities of copyrighted recordings to train generative-AI models. They alleged that AI companies were "replacing the work of human artists with massive quantities of AI created sounds . . . that substantially dilute the royalty pools paid out to artists." First Amended Complaint ("FAC") ¶2. They warned that AI-generated recordings risk "overrunning the market for human-made sound recordings." *Id.* ¶24. They also described AI as "poised to push the boundaries and expand commercial opportunities" while creating "enormous potential for abuse." *Id.* ¶7. Yet after settling those lawsuits in late 2025 and,

as alleged by the FAC, securing significant compensation and ongoing licensing revenue for themselves, Defendants now refuse to share any proceeds with the musicians whose work was copied, used for training, and incorporated into the models and platforms from which Defendants profit.

Defendants now move to dismiss on the theory that Article 21(a) requires a separate AFM agreement setting rates for AI use and that, because no such agreement exists, no payment is owed. But Article 21(a) is reasonably susceptible to more than one interpretation, and the AFM's reading is plausible, which is all that is required to survive a motion to dismiss. The AFM does not ask the Court to rewrite the SRLA or supply terms the parties did not agree to. It asks the Court to enforce what the parties wrote: a payment and notice regime when a signatory company uses a covered recording for a purpose not covered by the SRLA.

At the pre-motion conference in this case, the Court aptly described the new landscape ushered in by AI in the recording industry and the stakes for artists:

> This new use, I imagine maybe someone could have imagined it, but most people would not have imagined it prior to, say, 2023 or 4 or 5 when ChatGPT sort of exploded . So there is -- no one could have imagined it. You presumably now, based on what Mr. Asad has said, are using that music and have licensed with AI companies to train their models and are therefore, presumably, benefiting from that use. And so why shouldn't you pay the authors of that music?

*See* Transcript of July 21, 2026 Pre-Motion Conference Hearing ("Tr."), ECF No. 33-3 at 9:18-25.

The AFM has a stated a plausible claim for relief, all that is required at this stage of the litigation, and respectfully requests that Defendants' motions be denied.[1]

---

[1] Warner and Atlantic's August 14, 2026 Memorandum of Law in Support of [their] Motion to Dismiss the First Amended Complaint ("Warner MOL") largely adopts UMG's arguments in support of its motion to dismiss. Warner MOL, ECF No. 41. The AFM therefore addresses

## STATEMENT OF FACTS

The Parties and the SRLA

The AFM is the largest organization in the world representing musicians and, with its affiliated local unions, represents tens of thousands of professional musicians in the United States and Canada. FAC ¶10. Its members work for record companies as musicians—including as instrumentalists, orchestrators, producers, and arrangers of music—to record music in a variety of formats. The AFM serves as their collective bargaining representative, and for decades negotiated collective bargaining agreements, including the SRLA, with their employers, including the Defendants in this case. FAC ¶6. Defendants are among the largest music companies in the world (Universal is the largest). FAC ¶11. The AFM, Defendants and other recording companies are parties to the SRLA.[2] By entering into the SRLA, companies also agree to the terms of the Sound Recording Trust Agreement and the Sound Recording Special Payments Fund Agreement (the "SPFA"). *See* SRLA, Preamble. Pursuant to the SRLA, the recording companies are deemed to be authors and/or owners of all copyrights in the results and proceeds of services produced under the SRLA. SRLA, Article ("Art.") 26.

The music recording industry is frequently buffeted by change as technological developments change how music is produced, recorded, distributed and consumed. FAC ¶5. Since the 1940s, the AFM has therefore negotiated "new use" provisions in its contracts to

---

UMG's arguments as Defendants' collective arguments, and cites only to UMG's August 5, 2026 Memorandum of Law in Support of [its] Motion to Dismiss the First Amended Complaint ("UMG MOL"). UMG MOL, ECF No. 32. Where Warner and Atlantic have made different arguments, those are attributed only to them.

[2] The relevant SRLA for the purposes of these motions is the February 1, 2017 through January 31, 2020 SRLA, which is attached as Exhibit 2 to the August 5, 2026 Declaration of Ilissa Samplin in Support of Defendant [UMG's] Motion to Dismiss the First Amended Complaint, ECF No. 33.2.

ensure that musicians receive compensation and credit for their work across new technologies. FAC ¶6. The SRLA addresses new uses of recordings in Article 21(a), which provides that, except as set forth in paragraphs 21(b)-(h):

> if the Company uses a phonograph record . . . produced under any Sound Recording Labor Agreement since January 1954 . . . for a purpose not covered by this Agreement, the Company shall pay to those musicians who rendered services in the recording of the phonograph record . . . an amount equal to all payments (including, without limitation, pension contributions, but excluding health and welfare contributions) that would be required under the AFM agreement that would then be effective if the recording were originally made for the purpose set forth under that agreement.
>
> In order to effect such a "new use," the Company must first provide the Federation's Sound Recording Labor Agreement Contracts Administrator with the identity of the records involved and the intended use of the product in the form set forth in Exhibit F to this Agreement.[3]

Paragraphs 21(b) through 21(h) specify rates and related reporting and payment mechanics for enumerated new uses, including video games, non-traditional uses, low-fee traditional uses, mobile applications, low-fee lifecycle and similar licenses, and foreign licenses. FAC ¶37; SRLA Art. 21(b)–(h).

Defendants' Lawsuits against Udio and Suno

On June 24, 2024, Universal, Warner, and other record companies filed copyright infringement actions against Udio and Suno. Those complaints alleged that Udio and Suno scraped, copied, and ingested vast quantities of copyrighted recordings without authorization to train generative-AI models. FAC ¶¶ 19–25. Defendants' lawsuits characterize the AI companies' business models as a crisis that risks "overrunning the market for human-made recordings." FAC

[3] SRLA Art. 1 defines "phonograph record" and "record" as "any phonograph record, digital audio file, compact disc, tape recording or any other device reproducing sound, whether now in existence or which may come into existence."

¶24 (quotations omitted). They describe in detail how those AI platforms used recordings they had scraped and copied without authorization to train their programs generate new music based on user prompts. Defendants' lawsuits describe how user prompts can result in AI-generated recordings that resemble iconic songs, such as Chuck Berry's "Johnny B. Goode," and James Browns's "I Got You (I Feel Good)." FAC ¶¶19-21. Defendants also alleged that Suno and Udio monetized their services through subscriptions. FAC ¶25.

According to public reports, in late 2025, both Universal and Warner settled their claims against Udio and Warner settled with Suno. FAC ¶26. The settlements included compensation for past infringement and licensing arrangements authorizing continued use of recordings to train AI models and generate recordings in response to user inputs. FAC ¶¶ 26–31, 41–43.

The AFM alleges that Defendants' settlements and licensing arrangements with Suno and Udio included licensing of sound recordings subject to the SRLA and embody performances by AFM-represented musicians. FAC ¶32. Even though Defendants publicly praised the settlements as proof of their "commitment to do what's right by our artists and songwriters" and "a victory for the creative community," AFM-represented musicians did not share in the settlement proceeds. FAC ¶33.

The AFM commenced this action to rectify that wrong. The FAC alleges that AI use is not a purpose covered by the SRLA, and so falls under Article 21 as a "new use" that requires compensation to the musicians and notice to the AFM of what music was licensed and durations of the licenses, among other things. FAC ¶¶ 32, 44–49.

## STANDARD OF REVIEW

On a motion to dismiss made pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, courts "'constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor.'" *Romanova v. Amilus Inc.*, 138 F.4th 104, 108 (2d Cir. 2025) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "To state a claim, 'a complaint must allege sufficient facts . . . to state a plausible claim for relief.'" *Id.* at 109 (quoting *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [it] requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements . . . ." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 545 (2007). Nonetheless, "[t]he Court's charge in ruling on a Rule 12(b)(6) motion is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Roadrunner Charters, Inc. v. New York City,* No. 25-CV-01285 (JAV), 2026 WL 2149758, at *2 (S.D.N.Y. July 27, 2026) (quoting *Jennings v. Hunt Cos., Inc.*, 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019); *see also Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir. 2004) (same).

## ARGUMENT

### I. Governing Standard: A Motion to Dismiss a Breach of Contract Claim Should be Denied Where the Contract is Reasonably Susceptible to Multiple Interpretations and the Plaintiff's Reading is Plausible

In interpreting collective bargaining agreements, "traditional rules of contract interpretation apply as long as they are consistent with federal labor policies." *Aeronautical Indus. Dist. Lodge 91 of IAM v. United Techs. Corp.*, 230 F.3d 569, 576 (2d Cir. 2000) ("*Lodge 91*"). On a motion to dismiss, contractual ambiguities should be resolved in the plaintiff's favor. *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010); *see also Subaru Distribs.*

*Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005). A provision is ambiguous when it is "reasonably susceptible to more than one reading," in which case courts may consider bargaining history, past practices, and other CBA provisions. *Demolition Workers Union, Local 95 v. Mackroyce Contracting Corp.*, No. 97 CIV. 4094 LMM, 2000 WL 297244, at *3 (S.D.N.Y. Mar. 22, 2000); *Lodge 91*, 230 F.3d at 576.

At this stage, the AFM need not show that its interpretation is the most persuasive; it need only show that the contract is ambiguous and its reading is plausible. *Eternity Global*, 375 F.3d at 178; *see also Cambridge Capital LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 448 (S.D.N.Y. 2021). The question is whether the agreement is reasonably suscepticble to the AFM's interpretation, not whether Defendants' competing interpretation will ultimately prevail.

## II. The Complaint Should not be Dismissed Because Article 21(a) of SRLA is Reasonably Susceptible to More Than one Interpretation

Defendants contend that Article 21(a) applies only when either the SRLA or another AFM agreement supplies a rate for the new use. UMG MOL at 11-13. That reading is possible, but it is not compelled. As explained below, Article 21(a) can plausibly be read to impose a payment obligation triggered by the new use and to use existing AFM rates, or, at minimum, to leave the amount for later determination.

### A. Article 21(a) looks to the agreement that covers musicians' services, not what agreement covers the downstream use.

The central interpretive question is what Article 21(a) means when it directs the Company to pay "an amount equal to all payments . . . that would be required under the AFM agreement that would then be effective if the recording were originally made for the purpose set forth under that agreement."

Defendants interpret the phrase as a cross-reference to a separate AFM collective bargaining agreement governing the new medium or platform to which the recording has been licensed. UMG MOL at 11-13. As Warner describes their argument: Article 21(a) "ties any payment obligation to 'the AFM agreement that would then be effective' for the medium for which the license is made (e.g., AFM's agreement with film and television producers)" and that "[i]f, as here, no such AFM agreement exists providing payment terms for a particular use, Article 21(a) is inapplicable." Warner MOL at 2. Under this construction, Article 21 is not triggered unless an AFM agreement covers the specific end use.

But the provision is ambiguous and can be read to focus on the musician's services rather than the end use. Article 21(a) juxtaposes two references to "purpose." First, it contemplates that the Company uses a recording "for a purpose not covered by this Agreement . . . ." If that contingency occurs, the Company "shall pay" an amount "required under the AFM agreement that would then be effective if the recording were originally made for *the purpose* set forth under that agreement." (emphasis added) The first reference to "a purpose" concerns the Company's new use; the second concerns the recording's purpose. Defendants presume that the two references must point to different agreements, but that presumption is not required.

Rather, the second "purpose" can refer to the agreement that sets the rate for the work, not the agreement covering the distribution platform. Article 4 and Exhibit A to the SRLA confirm that the SRLA sets terms and conditions for musicians employed in making sound recordings and requires at least session scale rates for that work. SRLA Preamble, Arts. 2, 4 & Ex. A. If a musician were hired to make a recording for an AI platform, the session rate, benefits, and related payments would be knowable under the SRLA. Article 21(a) plausibly measures payment for reusing an existing recording by those then-effective terms. By measuring the

required amount according to the recording's purpose, this reading gives effect both to the trigger—use "for a purpose not covered by this Agreement"—and to the command to pay.

Defendants argue that this reading cannot hold because the "Agreements" referenced at the beginning and end of the clause must be different. But the language is ambiguous, and Defendants' reading is not the only plausible one. The first reference—to "this Agreement"—is to the SRLA. The last two—"the AFM agreement that would then be effective if the recording were originally made for the purpose set forth under that agreement"—can refer to an agreement other than the SRLA, as Defendants contend. The clause can also be read to refer to the SRLA when it covers the purpose for which the recording was made.

The SRLA's structure treats it as the agreement governing a musician's work on a recording made for any purpose. Article 8 mandates that "[t]he Company shall only call or authorize a recording session in order to make a phonograph record, a Covered Concert DVD or a Traditional Music Video," while Article 1 broadly defines "phonograph record" to include "any phonograph record, digital audio file, compact disc, tape recording or any other device reproducing sound, whether now in existence or which may come into existence." A recording made for an AI platform's use would still be a "phonograph record" under the SRLA, and the musician who made it would still be covered. The SRLA therefore qualifies as "the AFM agreement that would then be effective" for the musician's work, even if no separate agreement governs the AI platform.

Warner's reliance on Article 26 does not change the analysis. Warner MOL at 2. Article 26 addresses copyright ownership and the companies' right to exploit works "in any and all media, whether now known or hereafter invented;" it does not displace Article 21's separate contractual payment obligations for new uses. Article 21 exists because a company may own and

exploit a recording beyond the purpose for which the musician rendered services. The provisions serve different functions: Article 26 allocates ownership rights, while Article 21 imposes payment obligations when those rights are exercised for non-covered purposes. Warner's attempt to collapse the distinction between ownership and compensation finds no support in the text.

### B. Article 21(a) establishes a mandatory payment obligation.

#### 1. Article 21(a) requires that a signatory company "shall pay" the artist for a new use.

Independently, Article 21(a) can plausibly be read to impose a mandatory obligation whenever a signatory company uses a covered recording for a purpose outside the SRLA. The operative command is that the Company "shall pay;" the reference to another AFM agreement can reasonably be understood to determine the amount, not whether liability exists. "Shall" ordinarily creates a mandatory obligation. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (noting that the word "shall" is "mandatory" and "normally creates an obligation impervious to judicial discretion."). The reference to a rate therefore does not erase the separate payment command.

Defendants' contrary reading treats the measurement of the obligation as a condition to its existence. But Article 21(a) first identifies the event that triggers the duty—a recording used for a purpose not covered by the SRLA—and then directs the Company to pay. Whether the referenced provision supplies the final measure presents at most a question of interpretation and damages, not a basis to erase liability at the pleading stage. Defendants' suggestion that a nonexistent agreement necessarily reduces the amount to zero simply assumes its construction of Article 21(a) and cannot justify dismissal.

### 2. The Court may determine damages even in the absence of a formula for them

*AFM v. Sony Music Entertainment*, No. 15-CV-05249 (GBD) (BCM), 2016 WL 3031029 (S.D.N.Y. May 2, 2016), supports allowing the AFM's claim to proceed even if no payment formula expressly applies to AI use. In *Sony Music*, the AFM asserted a Section 301 claim against Sony for breach of Article 8 of the SRLA for holding a recording session that Sony intended to use in a movie, which was at the time not a purpose covered by the SRLA. *Id.* at *1-3. Sony, like Defendants, argued that because the SRLA did not specify damages or a method for calculating damages for a breach of Article 8, it could not be held liable and therefore did not have to provide damages-related information sought by the AFM in discovery. *Id.* at *2. The court rejected Sony's refusal to provide the information, holding that parties need not specify damages in advance and that "the absence of any provision for calculating damages [in the SRLA] does not mean there can be no damages." *Id*. at *3 ("parties to a contract are not required to specify, in advance, the damages to be awarded in the event of a breach."). The court also observed that Article 21(a) "would seem . . . to point" to another AFM agreement, the Motion Picture Agreement (the "MPA"), for a recording licensed into a film. *Id*. at *2 n.5. The court's comment is not a definitive conclusion—it "would seem"—and does not foreclose other interpretations of Article 21(a).

### 3. A damages calculation would not be too indefinite

Defendants' definiteness argument likewise confuses liability with remedy. The AFM alleges a binding payment obligation; damages may be calculated from the agreement and the record evidence. The absence of a precise formula is not a reason to dismiss before the parties identify the recordings, licenses, and revenues at issue. *See Sony Music*, 2016 WL 3031029, at *3 (granting AFM's motion to compel discovery regarding damages where

defendant company argued that SRLA provision at issue did not provide a measure of or method for calculating damages).

Because this is a Section 301 action, federal common law governs interpretation, informed by traditional state contract principles where consistent with federal labor policy. *Dist. Lodge 26, IAM v. United Techs. Corp.*, 610 F.3d 44, 51 (2d Cir. 2010); *see also Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103-04 (1962) (holding that federal common law, not state law, must be applied in adjudicating Section 301 claims). The federal common law that has developed under Section 301 allows district courts to impose a methodology for damages calculations. *See Lodges 743 & 1746, IAM v. United Aircraft Corp.*, 534 F.2d 422, 430, 447-48 (2d Cir. 1975) (affirming in part district court's methodology for calculating damages in LMRA Section 301 action in dispute over reinstatement of strikers); *Local 78, Asbestos, Lead & Hazardous Waste Laborers v. Termon Constr., Inc.*, 521 F. Supp. 2d 316, 318 (S.D.N.Y. 2007) (awarding attorney's fees to union for employer's "willful" breach of the collective bargaining agreement, in addition to failure to comply with court's discovery orders). That framework permits an award of direct and proximate damages that are reasonably certain even when the CBA does not specify the calculation. *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007).

Even under New York principles, Article 21(a) is not an unenforceable agreement. An open price is enforceable when "the amount can be determined objectively without the need for new expressions by the parties" through a method found in the agreement or ascertainable by trade usage. *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483, 548 N.E.2d 203 (1989). Article 21(a) supplies that method, and the SRLA contains objective measures—including session, streaming, and sampling rates—that can inform

the calculation. Those measures are not judicially invented. Exhibit A sets session rates for making phonograph records; the Sound Recording Special Payments Fund Agreement sets rates for audio streams; and Exhibit A's sampling provisions set payments when a Company licenses a recording containing a musician's services for a Covered Use. *See* SRLA Ex. A, § I.A(9); SRLA at 125-28, SPFA Addendum A § II. Whether a particular measure applies can be developed in discovery; it is not a pleading defect. *GEM Advisors, Inc. v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 326-27 (S.D.N.Y. 2009), is different: the contract there expressly required a "new expression" by the parties to fix consideration. Article 21(a) contains no such condition; it supplies a method by reference to existing AFM terms. *Anthem, Inc. v. Express Scripts, Inc.*, 16 Civ. 2048 (ER), 2022 WL 1558879 (S.D.N.Y. Mar. 31, 2022) (Ramos, J.), is likewise inapposite. It involved expectation damages for failure to negotiate a future contract, whereas the AFM sues to enforce an existing Article 21(a) obligation and seeks damages for breach; it does not seek to impose the terms of a contract that was never formed. 2022 WL 1558879, at *7-10.

**C. Article 21(a) would also apply to downstream uses by Suno and Udio.**

Even if Article 21(a) required a rate specific to the downstream use, the FAC plausibly alleges that Defendants' licenses permit uses covered by existing AFM terms. Udio's "Starstruck" platform reportedly lets users select specific artists and recordings to generate "Cover," "Reimagine," "Remix," and "Create" outputs, and permits those outputs to be marketed on streaming services. FAC ¶¶ 22–23. The pleaded licensing is therefore not limited to abstract model training; it plausibly reaches commercial exploitation connected to covered recordings and their derivatives.

If an AI-generated recording derived from a covered recording is marketed on Spotify, for example, the SRLA's existing audio-streaming provisions supply an objective rate. *See* SRLA at 125-28, SPFA Addendum A § II ¶¶ 10-12. Warner's response—that AI-generated

outputs themselves contain no AFM performances and that Suno and Udio are not SRLA signatories—misses the point. Warner MOL at 6. The AFM challenges Defendants' licensing of existing SRLA-covered recordings for AI training and generation (and failure to compensate musicians for that licensing). Discovery can determine whether the licenses also authorize downstream uses subject to existing rates.

UMG's objection that a use covered by an existing rate cannot also be a new use confuses the initial AI license with a later, separately regulated exploitation. UMG MOL at 21. Article 21(a) addresses a purpose not covered by the SRLA; if a license also authorizes a use for which the SRLA supplies a rate, that rate can inform the payment due for that component. At minimum, the pleading permits that inference, and only through discovery can the Court determine the scope of Defendants' licenses to Suno and Udio.

Nor is the theory impermissibly speculative. Exhibit F of the SRLA requires the Company to identify the intended use and the licensee or transferee, which is precisely why the AFM cannot know at the pleading stage what downstream rights Defendants granted. FAC ¶¶ 39-40; SRLA Ex. F. The AFM need not prove the scope of those licenses before discovery.

## III. The Structure of the SRLA and the Parties' Bargaining History Supports the AFM's Position that Defendants' AI Licenses are New Uses Under the SRLA

Article 21's history supports the AFM's reading. Before 1999, the SRLA categorically prohibited "dubbing," or reuse of recordings. *See* Letter from Eyad Asad to the Hon. Edgardo Ramos (July 17, 2026), ECF No. 25 (submitted response to UMG's pre-motion conference request). In 1999, the parties adopted a compensation system for reuse and later added targeted provisions for other uses, such as video games. Article 21(h) calls payments under 21(b)-(g) "new use" payments and preserves the AFM's right to collect them from

licensees. This structure distinguishes specific bargained rates from Article 21(a)'s broader trigger; it does not confine "new uses" to the enumerated categories.

Article 21(a) supplies the general rule for a use outside the SRLA, while 21(b)–(g) provide negotiated alternatives for specific categories. Paragraph 21(h) confirms that payments under 21(b)-(g) satisfy the "new use" obligation and that the AFM may collect new-use payments directly from licensees. The structure shows that the enumerated provisions are specific rate mechanisms, not an exhaustive definition of new uses.

Defendants read the enumerated provisions as proof that unlisted uses are uncompensated unless the parties later negotiate a separate agreement. *E.g.*, UMG MOL at 7. But the absence of AI language in the January 2023 SRLA says little about a technology that became commercially urgent only after Suno and Udio's conduct and Defendants' 2024 lawsuits. The issue on this motion is whether Article 21(a) reasonably reaches the pleaded use, not whether the AFM will ultimately prevail.

Nor does the AFM ask the Court to create an AI rate. As explained above, Article 21(a) can be read to incorporate existing AFM terms and to leave the amount for application after discovery. Determining which existing measure applies enforces the SRLA; it does not amend it.

*American Federation of Musicians & Employers' Pension Fund v. Atlantic Recording Corp*., 203 F. Supp. 3d 301 (S.D.N.Y. 2016), is distinguishable. There, the court rejected a claim based on an instrument that expressly disclaimed coverage of audio streams. *Id.* at 309-11. Nothing in the provisions at issue here disclaims payment or notice for AI-related licensing; Article 21(a) instead addresses uses not covered by the SRLA. The decision does not foreclose a plausible reading of this different language.

*Impax Laboratories, Inc. v. Turing Pharmaceuticals AG*, 16 Civ. 3241 (ER), 2017 WL 4357893, at *10 (S.D.N.Y. Sept. 28, 2017), likewise involved an attempt to insert a limitation absent from the contract in deciding liability. The AFM asks the Court to apply the words "shall pay" and the existing measures described above, not to add a term. Warner's reliance on *H.K. Porter Co. v. NLRB*, 397 U.S. 99, 108 (1970), and related cases is misplaced for the same reason: those cases prevent a court from compelling a new CBA bargain; they do not bar enforcement of an existing one. *See N.Y. Dist. Council No. 9, Int'l Bhd. of Painters & Allied Trades v. NLRB*, 453 F.2d 783, 787–88 (2d Cir. 1971). The AFM seeks no new bargain, and ongoing negotiations do not suspend the SRLA's current obligations. Because the SRLA contains no grievance or arbitration procedure, the AFM properly seeks judicial enforcement.

## IV. The Parties' Experience with Video Games Establishes that Article 21(a) is Subject to Different Interpretations

At the pre-motion conference, counsel for Warner, who also represented and continues to represent the recording industry as a whole in SRLA bargaining, explained:

> [] [T]he other thing I would just note is that the history of the Collective Bargaining Agreement – again, I have represented the employer parties here since 2009, when both the video game provisions and the foreign licensing provisions were added. Both of those provisions were added as a result of a dissimilar dispute, which was a question as to whether or not there was, in fact, an applicable AFM agreement for those types of licenses, and then it was resolved at the bargaining table.

Tr. at 13:18-25.

That history confirms that the parties have treated the applicability of existing AFM terms to emerging uses as a disputed interpretive question before bargaining specific rates. The later addition of targeted video-game and foreign-license provisions does not establish that no obligation existed before amendment; it confirms that Article 21(a) can operate as the general

new-use provision. At minimum, the history reinforces that Defendants' reading is not the only reasonable one.

## V. The SRLA's Provisions Covering Sampling Constitute an AFM Agreement that Applies to Defendants' AI Licenses

Even if Article 21(a) requires a rate from an agreement other than the SRLA, the SRLA's sampling provisions supply one for at least part of the pleaded conduct. They define "sampling" to include encoding a portion of a phonograph record containing a Covered Musician's performance into a computer or other device for playback in another song, and require payment when the Company licenses a recording containing covered services for a Covered Use. SRLA, Ex. A § I.A(9)(a)(2), (4), (b).

The FAC alleges that Defendants licensed covered recordings to AI companies, which ingest those recordings into computer systems used to train their models and generate and play other songs. That conduct plausibly falls within the SRLA's references to a computer or other playback device and use in another song. Warner's argument that the outputs are not SRLA-covered misses the point: the alleged sampled material is the existing SRLA-covered recording, and the alleged licensor is the signatory company. Warner MOL at 6.

Thus, even under Defendants' construction, the sampling provisions provide an existing contractual payment reference; at minimum, they make dismissal premature.[4]

[4] In the event the Court determines that sampling plausibly encompasses Defendants' licensing of covered recordings to Suno and Udio but falls outside of the SRLA's "new use" provision, the AFM respectfully requests permission to amend its pleadings to include a claim that AI use is covered by the parties' sampling agreements.

## VI. The SRLA Requires Defendants to Provide Notice and Information Regarding Their Sampling Arrangements with Suno and Udio

Article 21(a)'s notice obligation is independently enforceable. After stating the payment rule for a recording used "for a purpose not covered by this Agreement," the provision separately states: "In order to effect such a 'new use,' the Company must first provide the [AFM's] Contracts Administrator with the identity of the records involved and the intended use of the product in the form set forth in Exhibit F" to the SRLA. SRLA Art. 21(a). The clause uses "must first provide," not aspirational language or a condition that applies only after payment liability is established. It imposes a separate contractual step before the Company effects the use. The FAC alleges that Defendants licensed SRLA-covered recordings to Suno and Udio for AI training and generation and provided none of the required information. FAC ¶¶41–49.

UMG argues that notice is derivative of payment and arises only when there is a compensable new use. UMG MOL at 23–24. That reading is untenable because it would render the notice obligation circular and self-defeating: a signatory company could license a covered recording for a purpose not covered by the SRLA, decline to notify the AFM, and then defend against a notice claim by arguing that no payment formula exists for that use. In other words, a company's own failure to provide notice would shield it from liability for that very failure. The notice provision serves a broader function. It allows the AFM to monitor how covered recordings are used, identify the musicians and recordings affected, determine the intended use and licensee, and protect musicians' contractual interests. The word "such" in "such a new use" refers back to the trigger in the preceding clause, a use "for a purpose not covered by this Agreement," not to the separate question whether the payment amount has been established. The duty is triggered by the new use itself, not by the existence of a payment formula.

Warner's reliance on *Hartford Roman Catholic Diocesan Corp. v. Interstate Fire & Cas. Co.*, 905 F.3d 84, 89 (2d Cir. 2018), is misplaced. Warner says "such" is a term of limitation that confines notice to uses for which another AFM agreement exists. But "such" here simply refers to the "new use," defined in Article 21(a). It does not add a second requirement that the parties have already negotiated an AFM agreement for that purpose. *Hartford* recognizes that "such" may reference what was previously specified; it does not transform a clear antecedent

into a new limitation. Reading Warner's extra limitation into Article 21(a) would make the notice duty disappear in the very cases in which the AFM most needs the information.

Exhibit F confirms that notice is not merely an appendage to payment. It is titled "AFM Standard Form Required for Any New Use of or Transfers of the Right to Use Sound Recordings" and states that it must be filed to effect either (1) a new use by the signatory Company or (2) a sale, lease, license, or other transfer of title or permission to use an SRLA-produced recording in another sound recording or medium. The form then requires the Company to identify the song or recording, artist, release date, intended use, date of transfer, and licensee or transferee information. The second reporting obligation—covering a sale, lease, license, or permission to use—does not depend on whether the use is a "new use" under Article 21(a). Article 21(a)'s express incorporation of Exhibit F therefore confirms that third-party licensing itself is reportable. SRLA Art. 21(a); SRLA, Ex. F; FAC ¶¶39-40.

Even on Defendants' reading, the notice claim survives. Defendants do not dispute that the AI licenses involve a "purpose not covered by this Agreement;" their dispute is whether that new use carries a payment obligation. That concession triggers the first sentence of Article 21(a), while Exhibit F and Article 24(b) independently require information about the licenses. Article 24(b) requires employer signatories to provide the AFM, within sixty days of each sale, assignment, lease, license, or other transfer of a covered recording, the identity of the recordings, intended use, transfer date, and the purchaser, licensee, or transferee's identifying and contact information. It is not limited to "new uses" or transfers for which a separate AFM agreement supplies a rate. Defendants' refusal to provide that information states a separate breach regardless of how the Court ultimately resolves the payment dispute.

## CONCLUSION

Article 21(a) of the SRLA is reasonably susceptible to more than one interpretation, and the AFM's reading is plausible. The text imposes a mandatory payment obligation when a signatory company puts a covered recording to a purpose not covered by the SRLA, and existing provisions of the SRLA, including session rates, streaming rates, and sampling rates, supply objective measures from which damages can be determined. The notice obligation operates independently and is triggered by the new use itself, not by the existence of a payment formula. Defendants' motions to dismiss should be denied.

Dated: September 4, 2026
New York, New York

/s/ *Eyad Asad*
Eyad Asad
Cohen, Weiss and Simon LLP
909 Third Avenue, 12th Floor
New York, New York 10022
(212) 356-0249
easad@cwsny.com

*Attorneys for Plaintiff*
*American Federation of Musicians of*
*The United States and Canada*